UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| LISA TORNABENE,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>CITY OF BLACKFOOT, a political subdivision of the State of Idaho, and MARC CARROLL, in his individual and official capacity,<br><br>　　　　Defendants. | Case No. 4:22-cv-00180-AKB<br><br>**MEMORANDUM DECISION AND ORDER** |

## I.    INTRODUCTION

Plaintiff Lisa Tornabene filed this action against her former employer, the City of Blackfoot, and the City's mayor, Marc Carroll. (Dkt. 1). As against the City, Tornabene alleges claims for: (1) failing to accommodate her disability and unlawfully terminating her employment in violation of the Americans with Disabilities Act Amendments Act ("ADAAA"), 42 U.S.C. § 12101, *et seq.*; the Rehabilitation Act, 29 U.S.C. § 701, *et seq.*; and the Idaho Human Rights Act ("IHRA"), Idaho Code § 67-5901, *et. seq.*; and (2) gender discrimination in violation of Title VII of the Civil Rights Act ("Title VII"). As against both the City and Carroll, Tornabene alleges claims for: (3) for violating the Equal Protection Clause of the Fourteenth Amendment, 42 U.S.C. § 1983; and (4) violating the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.*

Defendants moved for summary judgment on these claims. (Dkt. 29). On August 20, 2024, the Court held a hearing on their motion and Tornabene's related motion to strike. (Dkt. 40). For the reasons set forth below, the Court denies Tornabene's motion to strike and grants in part and denies in part Defendants' summary judgment motion.

## II.   BACKGROUND

### A.   Factual Background

The following recitation of facts reflects Tornabene's factual submissions, which the Court credits for purposes of summary judgment. *E.E.O.C. v. Boeing Co.*, 577 F.3d 1044, 1046 (9th Cir. 2009) (relying on nonmoving party's factual submissions for summary judgment).

#### 1.   Human Resources Director Position

Tornabene worked for the City as its Human Resources Director from 2015 until the City terminated her employment in September 2021. As the HR Director, Tornabene reported to the City Clerk, Suzanne McNeel, and to Carroll. According to the City's job description, the HR Director's primary functions included developing and implementing personnel policies, overseeing personnel records management, monitoring and assuring city-wide legal compliance, overseeing general employee relations and development, monitoring policies to assure fair and consistent treatment of employees, developing personnel strategies and policies, and investigating alleged legal violations. (Dkt. 29-4 at p. 6). This job description states, "The principal duties of the position are performed in a general office environment." (*Id.*).

#### 2.   Remote Work

Between 2015 until March 2020, Tornabene worked a traditional schedule from her office in City Hall, although she performed most of her duties by telephone and on the computer.

(Dkt. 34-10, ¶¶ 11, 16). In March 2020, Tornabene and other City staff began working remotely during the pandemic. At that time, Tornabene set up a home office where she had all the equipment and technology she needed to work efficiently, including a desk, a computer, monitors, a printer with fax and scanner capabilities, an office chair, video conferencing capabilities, and filing space to store documents until she could file them at City Hall. Additionally, she had full, remote access to the City's network. (Dkt. 34-10, ¶ 12).

Tornabene easily transitioned to remote work for the City. (Dkt. 34-3 at p. 21). According to Tornabene, she worked better from home where she "could more easily maintain confidentiality." (Dkt. 34-10, ¶ 13). When she was in her office at City Hall, she had to shut her door when someone dropped by or telephoned her, and she worried other employees would see her talking to someone behind closed doors or overhear her conversations. (*Id.*).

By the summer of 2020, most of the City's staff had returned to the office. Tornabene, however, continued to work remotely to protect her elderly parents from contracting the virus. Then, in early September 2020, Tornabene was diagnosed with COVID-19 and was severely ill for approximately six weeks. (Dkt. 34-3 at p. 4). During this time, she made multiple trips to the emergency room and struggled to recover. (*Id.*). The severity of her illness left her unable to perform her normal work tasks from September through October 2020. As she recovered, however, she began working from home again. (Dkt. 34-10, ¶ 20).

Although recovering and able to work remotely, Tornabene's symptoms persisted, and she developed long COVID-19, including breathing problems, headaches, chronic fatigue, brain fog, and vertigo. (Dkt. 34-3 at p. 4). Her treating nurse practitioner, Gus Grimmett, advised her to continue working remotely. (Dkt. 34-10, ¶ 22; Dkt 34-15, Ex. E). In December 2020, Tornabene informed Carroll that she was not medically cleared to return to the office. (Dkt. 34-10, ¶ 23). At

**MEMORANDUM DECISION AND ORDER - 3**

that time, she was working remotely but coming to the office only as necessary. (*Id.*). Initially, the

City accommodated Tornabene's request to work from home. (Dkt. 34-3 at p. 15).

While Tornabene was working from home between December 2020 and her September

2021 discharge, Tornabene's husband, Scott Denning, drove Tornabene[1] to City Hall two or three

times per week to onboard new employees, to meet with employees, to file paperwork, to perform

factfinding for employee relations, to consult with managers, to conduct interviews, or to do other

tasks. (Dkt. 34-3 at pp. 13-14; Dkt. 34-10, ¶¶ 23, 36; Dkt. 34-22, ¶¶ 15, 18). When taking

Tornabene to her office in City Hall, Denning helped Tornabene with various tasks, including

faxing, retrieving file folders, or shredding documents. (Dkt. 34-22, ¶ 15). Some of the folders

Denning filed for Tornabene contained confidential personnel documents. (*Id.*).

Denning, however, only handled "folders"—not individual documents—and he did not see

the folders' contents. He filed personnel folders in the "vault" where the City stored its personnel

folders. (Dkt. 34-22, ¶ 15). The City only allows designated employees access to the vault. (*Id.*)

McNeel and Carroll knew Denning, who was not a City employee, was assisting Tornabene at her

office. (*Id.* ¶ 17). For example, McNeel downloaded a security video of Denning accessing the

vault while assisting Tornabene and showed the video to Carroll and the City's legal counsel.

Neither McNeel, Carroll, nor the City's legal counsel, however, expressed any concern to

Tornabene about Denning helping her. (Dkt. 34-5 at p. 15; Dkt. 34-3 at pp. 24-25).

Sara Furu, an administrative assistant for the City Clerk's Office, also helped Tornabene

with administrative tasks at City Hall. Both Tornabene and Furu testified that McNeel had

---

[1]     One of Tornabene's long-COVID symptoms is dizziness, so she is uncomfortable driving.
(Dkt. 34-3 at p. 7).

approved Furu helping Tornabene with administrative tasks, including filing in the vault, even before the pandemic occurred. (Dkt. 34-3 at pp. 24, 29; Dkt. 34-6 at pp. 4-5). While working remotely, Tornabene also asked Furu to delete voicemails from her phone at City Hall. Tornabene had already listened to these voicemails at home, which she received via email attaching the messages; therefore, Furu could simply delete the voicemail messages without listening to them. (Dkt. 34-3 at p. 28; Dkt. 34-6 at p. 7). Furu denied receipt of any confidential personnel information while assisting Tornabene. (Dkt. 34-6 at p. 5).

Other than when Denning drove Tornabene to City Hall and occasionally to other department buildings, Tornabene performed her duties remotely, including addressing employee relations issues, consulting on benefits, updating the website, participating in interviews, processing onboarding documents, attending weekly staff meetings with the Mayor, setting up training sessions, and answering questions. (Dkt. 34-3 at p. 15).  During the time when Tornabene was working remotely from her home office and going to City Hall as necessary, no one ever told her directly that they could not reach her; she was not responding quickly enough; she was not completing tasks as required; or she could not have her husband or Furu assist her. (Dkt. 34-10, ¶¶ 17, 34-35; Dkt. 34-5 at pp. 7-11, 17-18, 20-21, 37.

### 3.    Tornabene's Termination

In April 2021, Carroll met with Tornabene and advised her that having regular, in-person office hours was an essential function of the HR Director position. By then, the City had operated for over a year without an HR Director in the office, and Carroll felt Tornabene needed to return to the office, for at least two hours a day. (Dkt. 34-4 at pp. 10-11). Carroll testified that he felt uncomfortable calling Tornabene at home and that she needed to have designated in-office hours each day to be available for in-person consultations with department heads and other employees.

MEMORANDUM DECISION AND ORDER - 5

(*Id.* at p. 13). Carroll also testified about complaints from other department heads about Tornabene's remote work as a reason for requiring in-person office hours, but he would not tell Tornabene who had complained about her or what their specific complaints were. (Dkt. 34-4 at pp. 11-12).

Tornabene's medical provider, however, continued to opine Tornabene should continue working from home, and she requested the City accommodate her by allowing her to continue working from home while going to the office as necessary. In response, Carroll insisted Tornabene either maintain regular, in-person office hours or take short-term disability leave. (Dkt. 34-4 at pp. 8-10). Tornabene did not want to take leave but had no other option because her condition was impossible to predict, and as a result, she could not commit to being at City Hall for two, regularly designated hours a day, five days a week. (Dkt. 34-3 at pp. 15-16).

Near the end of July 2021, Tornabene exhausted her short-term disability leave, and Carroll again asked her to return to the office at least part-time. Tornabene responded by providing a letter from Grimmett, who opined it was "medically necessary" for Tornabene to continue working from home and suggested she be re-evaluated after eight weeks to determine whether her condition had improved. (Dkt. 34-3 at pp. 18-19, Ex. 9; Dkt. 34-21 at p. 37).

The City insisted on a second opinion and claimed it could force Tornabene to see the City's doctor. (Dkt. 34-4 at pp. 8-10). Tornabene responded, asking the City to identify what was unacceptable about Grimmett's letter, inquiring what additional information she could provide from her own medical providers, and requesting the City to contact Grimmett. (Dkt. 34-21 at p. 16). Thereafter, the City denied Tornabene's requested accommodation and terminated her employment in September 2021.

**MEMORANDUM DECISION AND ORDER - 6**

## III.    LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The trial court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (citation omitted). In considering a motion for summary judgment, the court must "view[ ] the facts in the non-moving party's favor." *Id.* To defeat a motion for summary judgment, the respondent need only present evidence upon which "a reasonable juror drawing all inferences in favor of the respondent could return a verdict in the respondent's favor." *Id.* (citation omitted).

The trial court must enter summary judgment if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The respondent cannot simply rely on an unsworn affidavit or the pleadings to defeat a motion for summary judgment; rather, the respondent must set forth the "specific facts," supported by evidence, with "reasonable particularity" that precludes summary judgment. *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001).

## IV.    ANALYSIS

### A.    Motion to Strike

Tornabene objects to various statements in McNeel's declaration (Dkt. 29-3), asserting that they contradict her deposition testimony or that she lacks personal knowledge to make the statements. The Court does not rely on these statements, however, to evaluate the merits of

Defendants' summary judgment motion. Rather, the Court relies on McNeel's statements in her deposition regarding the same subject matter. For this reason, the Court overrules Tornabene's objections to McNeel's declaration as moot.

Additionally, Tornabene raises hearsay objections to various statements in Carroll's deposition regarding what department heads said about Tornabene. The Court agrees these statements are inadmissible to the extent Defendants offer them for the truth of the matter asserted. The statements, however, are admissible to show Carroll's state of mind and the reasons he terminated Tornabene's employment. In reaching its decision, the Court has not considered any hearsay statement for the truth of the matter asserted. Accordingly, the Court overrules Tornabene's objections to these statements.

**B.    Disability Discrimination and Reasonable Accommodation: ADAAA, Rehabilitation Act, and IHRA**

In Counts I through IV, Tornabene alleges the City failed to accommodate her disability and unlawfully terminated her employment in violation of the ADAAA, the Rehabilitation Act, and the IHRA. (Dkt. 1 at ¶¶ 33-62). The parties agrees the analysis for these claims is the same. *See, e.g.*, *Csutoras v. Paradise High School*, 12 F.4th 960, 969 n.11 (9th Cir. 2021) (noting no significant difference in analysis of rights and obligations created by ADA and Rehabilitation Act). Accordingly, the Court analyzes these claims together.

An employer is prohibited from discriminating against a qualified individual with a disability because of that disability. *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1246 (9th Cir. 1999). An employer's failure to provide a reasonable accommodation can be an act of discrimination. *Snapp v. United Transp. Union*, 889 F.3d 1088, 1095 (9th Cir. 2018). To establish discrimination for failure to provide a reasonable accommodation, a plaintiff must show that:

(1) she is a "qualified individual"; (2) the defendant received adequate notice of the plaintiff's disability and desire for a reasonable accommodation; and (3) a reasonable accommodation is available that would have enabled the plaintiff to perform the essential functions of the job. *Id.*

### 1.    Qualified Individual

A "qualified individual" means "an individual 'with a disability who, *with or without reasonable accommodation*, can perform the essential functions of the employment position.'" *Dark v. Curry Cnty.*, 451 F.3d 1078, 1086 (9th Cir. 2006) (quoting 42 U.S.C. § 12111(8)); *see also* 29 C.F.R. § 16320.2(m). A plaintiff bears the burden of proving she is "qualified." *Dark*, 451 F.3d at 1086. The court must first consider whether the plaintiff can perform the job's essential functions without reasonable accommodation; if she cannot, then the court considers whether she can do so with a reasonable accommodation. *Id.* (citing *Kaplan v. City of North Las Vegas*, 323 F.3d 1226, 1231 (9th Cir. 2003)).  If the plaintiff cannot perform the essential functions at the time of the alleged discrimination, "then the ADA's employment protections do not apply." *Cripe v. City of San Jose*, 261 F.3d 877, 884-85 (9th Cir. 2001). Conversely, if the plaintiff can perform a job's essential functions with or without a reasonable accommodation, then she is a qualified individual under the ADAAA. *Id.*

For purposes of summary judgment, the City does not dispute that Tornabene is disabled, has the requisite qualifications and skills for the job, and has suffered an adverse employment action. Rather, it argues Tornabene cannot establish a prima facie case of disability discrimination because she is not a "qualified individual" who can perform the essential functions of the HR Director position. (Dkt. 29-1 at p. 2). The record is undisputed that at the time the City terminated Tornabene's employment, she could not perform the position without accommodation. At issue then is whether the City's requirement that Tornabene "maintain regular in-person office hours"

MEMORANDUM DECISION AND ORDER - 9

"for at least a few hours each day" (hereafter the "regular, in-person requirement") is an essential function of the HR Director position. (*See* Dkt. 29-1 at pp. 2, 8) (describing requirement). If it is, then Tornabene's disability claims necessarily fail because she concedes she could not perform this function. If, however, the requirement is not an essential function of the position, then at issue is whether Tornabene's request to continue working remotely, except as necessary, was a reasonable accommodation.

### 2.      Essential Function

The "essential functions" of the job refer to the "fundamental job duties" of the employment position. 29 C.F.R. § 1630.2(n)(1). A job function is essential if removing it would fundamentally alter the position. *Cripe*, 261 F.3d at 884. Essential functions do not "include the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1). "A job function may be considered 'essential' for various reasons." *Dark*, 451 F.3d at 1087 (citing § 1630.2(n)(2)(i)-(iii)).

A court must consider the employer's judgment regarding what job functions are essential, including any "written [job] description" the employer prepared. 42 U.S.C. § 12111(8). "Such evidence, however, is not conclusive." *Rohr v. Salt River Project Agric. Imp. & Power Dist.*, 555 F.3d 850, 864 (9th Cir. 2009). An employer may not turn every condition of employment into an essential function by including it in a job description. *Id.* Rather, determining a particular job's essential functions is a "highly fact-specific inquiry." *Cripe*, 261 F.3d at 888 n.12.

The employer has the burden of production to establish what job functions are essential. *Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1237 (9th Cir. 2012); *see also Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 991 (9th Cir. 2007) (ruling employer has "burden of production" to produce evidence of essential functions). If the evidence is conflicting regarding a

position's essential functions, a factual dispute precluding summary judgment exists "notwithstanding the [employer's] job description." *Rohr*, 555 F.3d at 864.

The City argues the regular, in-person requirement is undisputedly an essential function of the HR Director position. (Dkt. 29-1 at pp. 2-8). In support, the City cites evidence of its pre-lawsuit position that the requirement is essential including: (1) Tornabene's Notice of Termination stating "an essential function of the HR Director [is] to be available for face-to-face discussions, walk-in visits, investigations into disciplinary issues, and many other requirements of the position" (Dkt. 34-4 at 51); (2) the HR Director job description, stating that "the principal duties of the position are performed in a general office environment" (Dkt. 29-4, Carroll Decl., Ex. A); and (3) Carroll's testimony that he "needed an HR Director who was in the workplace" and that department heads had complained about Tornabene working remotely. (Dkt. 29-5 at p. 34, Carroll Dep. 86:8-14).

Additionally, the City cites evidence suggesting Tornabene was failing to perform her job while working remotely. (*See, e.g.*, Dkt. 51 at pp. 3-4) (arguing Tornabene "had to pawn off" her job duties on other employees "to accommodate" her remote work). This evidence includes Tornabene's reliance on Furu's and Denning's assistance to perform certain of duties. Further, the City relies on two October 2020 emails, one which Tornabene instructs a City employee how to conduct an employee interview in her absence and another in which she instructs a City employee about onboarding a new employee, including retrieving materials from Tornabene's office. (Dkt. 50-4, pp. 1-2, 4-5).

However, this evidence—either singularly or cumulatively—does not undisputedly establish the regular, in-person requirement is an essential function of the HR Director position for numerous reasons. For example, Tornabene sent the two emails instructing other employees in

October 2020, when it is undisputed she was suffering from her initial COVID diagnosis and on leave from work. For this reason, the emails are not relevant in determining whether Tornabene was a qualified individual in September 2021 when she was suffering from long-COVID, and the City terminated her employment.

Likewise, that Tornabene received assistance from Denning and Furu does not conclusively establish the regular, in-person requirement is an essential function of the position. The evidence shows that McNeel had approved Tornabene's reliance on Furu for assistance; the HR Director job description states only that Tornabene was to "oversee[] personnel records management" (Dkt. 34-8 at p. 11) and did not require her to handle personnel records exclusively; Tornabene had already heard the voicemails Furu deleted for her and did not rely on Furu to listen to those messages; and the City never objected to Denning assisting Tornabene, even though they were aware of his assistance and the nature of that assistance.

Also, the City's statement in Tornabene's Notice of Termination about the regular, in-person requirement being essential, the statement in the HR Director job description about performing duties in the "general office environment," and Carroll's testimony about needing an in-person HR Director do not establish the requirement is an essential function of the position. As Circuit courts have noted, an employer's written job description is not conclusive and an employee's "presence at work is not an essential function of the job simply because an employer says it is." *See Hostettler v. Coll. of Wooster*, 895 F.3d 844, 857 (6th Cir. 2018) (ruling employer cannot simply declare in-person presence is essential); *Rohr*, 555 F.3d at 864 (ruling job description is not conclusive evidence of essential job function).

Finally, Carroll's testimony about others' complaints regarding Tornabene's remote work does not establish the regular, in-person requirement is an essential function. The City does not

present admissible evidence that the complaints occurred, when they occurred, or to what they related. In contrast to Carroll's testimony, Tornabene submits the declaration of Scott Gay, who served as the City's Chief of Police from 2019 until 2022. Gay attests that he "experienced no difficulty with [Tornabene] working remotely" and that, to his knowledge, "no one in the police department had experienced any difficulty with her working remotely either." (Dkt. 34-23 at p. 3, Gay Decl. ¶ 18). According to Gay, Tornabene was available and helpful to him and other members of law enforcement as needed, even when matters arose outside normal business hours or on weekends. (*Id.* at p. 2, Gay Decl. ¶ 14). He maintains Tornabene "fulfilled her duties so well, [he] hardly noticed she was working remotely." (*Id.*, Gay Decl. ¶ 15).

Tornabene appears to acknowledge that at least some of her job duties required her to be in person. For example, she testified that she would go to the office during the day "regardless of [her long-COVID] symptoms because [she] did not want to neglect [her] city clients" and that she would "push" herself to work in person. (Dkt. 34-3, pp. 8-9, Tornabene Dep. 31:22-33:8). Despite this acknowledgement, Tornabene maintains her disability did not permit her to be at work on "certain days and certain times" because the severity of her symptoms varied from day-to-day. (*Id.*). In other words, Tornabene challenges the City's requirement that she maintain *regular*, in-person office hours. (*See* Dkt. 29-1 at p. 8) (describing requirement as "maintain[ing] regular in-person office hours").

Indeed, whether maintaining *regular*, in-person office hours is an essential function of the HR Director position presents a genuine, material factual issue for trial. Other than the City's general assertions that the regular, in-person requirement is an essential function of the position because the HR Director needs to be available in person to perform certain duties, it fails to present evidence the HR Director's presence must be "regular." Meanwhile, Tornabene has presented

evidence that she could perform the essential functions of her job while working mostly remotely, including setting up interviews, onboarding, assisting department heads, handling worker's compensation claims, assisting with city policy updates, managing the City website, scheduling drug screenings, attending meetings, and helping with payroll. For those tasks requiring in-person performance, Tornabene has presented evidence that she would and did come to the office as needed. Given the conflicting evidence, the Court concludes the issue of whether the regular, in-person requirement is an essential function of the HR Director position presents factual issues precluding summary judgment.

### 3.      Reasonable Accommodation

Assuming a jury were to conclude the regular, in-person requirement is not an essential function of the HR Director position, then whether Tornabene's suggested accommodation was reasonable is at issue. *See Mustafa v. Clark Cnty. Sch. Dist.*, 157 F.3d 1169, 1176 (9th Cir. 1998); *see also Cripe*, 261 F.3d at 885. Determining whether a proposed accommodation is reasonable, "including whether it imposes an undue hardship on the employer, requires a fact-specific, individualized inquiry." *Nunes*, 164 F.3d at 1247. In the summary judgment context, a court should weigh the risks and alternatives, including possible hardships on the employer, to determine whether a genuine issue of material fact exists as to the reasonableness of the accommodation. *Id.*

The plaintiff bears the initial burden of showing the existence of a reasonable accommodation that would have enabled her to perform the essential functions of the position. *Dark*, 451 F.3d at 1088. To avoid summary judgment, however, the plaintiff only needs to present "evidence sufficient to make at least a facial showing that reasonable accommodation is possible." *Buckingham v. United States*, 998 F.2d 735, 740 (9th Cir. 1993) (internal quotation marks and citation omitted). Once the plaintiff establishes the existence of a reasonable accommodation, then

"the burden switches to the defendant to show that this accommodation would constitute an undue hardship." *Zukle v. Regents Univ. of California*, 166 F.3d 1041, 1047 (9th Cir. 1999).

Tornabene's requested accommodation was to continue working remotely while going to the office only as necessary. Generally, courts have concluded that working remotely is arguably a viable accommodation in certain circumstances. *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1136 (9th Cir. 2001) (citing EEOC Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act, FEP (BNA) 405:7601, at 7626 (March 1, 1999)) (finding "at least a triable issue of fact as to whether [the plaintiff] would have been able to perform the essential duties of her job with the accommodation of a work-at-home position"). More recently, the EEOC has reiterated teleworking may be a reasonable accommodation for long-COVID, noting "possible types of reasonable accommodations to address various symptoms of Long COVID" include, among others, "a *flexibl*e schedule or telework to address fatigue." *What You Should Know about COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws*, ¶ D.19 (May 15, 2023) (emphasis added).[2]

As already noted, Tornabene has presented evidence she performed well while working mostly remotely. As a result, she met her initial burden of showing an accommodation of mostly remote work would have allowed her to perform the essential functions of her job. Based on this evidence, the City must show Tornabene's suggested accommodation was unreasonable or would impose an undue hardship. The City, however, has failed to submit any evidence or even argue

---

[2]   This more recent EEOC guidance also cautions against employers automatically terminating reasonable accommodations that were provided due to pandemic-related circumstances. *Id.* at ¶ D.20. https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws (last visited 08/19/2024).

MEMORANDUM DECISION AND ORDER - 15

that allowing Tornabene to continue to work remotely would have been unreasonable or otherwise imposed an undue hardship on the City. *See Humphrey*, 239 F.3d at 1136 ("Working at home is a reasonable accommodation when the essential functions of the position can be performed at home and a work-at-home arrangement would not cause undue hardship for the employer."). Accordingly, the Court concludes the issue of whether Tornabene's suggested accommodation was reasonable presents a genuine, material, factual issue precluding summary judgment.

### 4.      Interactive Process

Moreover, even if the City had shown Tornabene's suggested accommodation was unreasonable or created an undue hardship, the analysis does not end there. Rather, an employer has a duty to engage in the "interactive process." This process is "the statutorily required collaborative effort for identifying an employee's abilities and an employer's possibly reasonable accommodations." *Snapp*, 889 F.3d at 1091. "[N]otifying an employer of a need for an accommodation triggers a duty to engage in an 'interactive process' through which the employer and employee can come to understand the employee's abilities and limitations, the employer's needs for various positions, and a possible middle ground for accommodating the employee." *Id.* at 1095; *see also Humphrey*, 239 F.3d at 1138 ("[T]he employer's obligation to engage in the interactive process extends beyond the first attempt at accommodation and continues when the employee asks for a different accommodation or where the employer is aware that the initial accommodation is failing[,] and further accommodation is needed."). Once an employer becomes aware of an employee's need for an accommodation, the employer has a mandatory obligation to engage in the interactive process. *Id.* at 1137.

The Ninth Circuit has previously held that "employers, who fail to engage in the interactive process in good faith, face liability for the remedies imposed by the statute if a reasonable

accommodation would have been possible" and that "an employer cannot prevail at the summary judgment stage if there is a genuine dispute as to whether the employer engaged in good faith in the interactive process." *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1116 (9th Cir. 2000), *vacated sub nom. US Airways, Inc. v. Barnett*, 535 U.S. 391 (2002). Clarifying this holding, the Ninth Circuit has noted that "the task of proving the negative—that *no* reasonable accommodation was available—rests with an offending employer throughout the litigation, and that, given the difficulty of proving such a negative, it is not likely that an employer will be able to establish on summary judgment the absence of a disputed fact as to this question." *Morton v. United Parcel Serv., Inc*., 272 F.3d 1249, 1256 n.7 (9th Cir. 2001), *overruled on other grounds by Bates*, 511 F.3d 974.

In other words, the City bears the burden of proving that its failure to engage in the interactive process should be excused because no reasonable accommodation would have been available in any event.  *Dark*, 451 F.3d at 1088. If an employer did not engage in the interactive process, "summary judgment is available only if a reasonable finder of fact *must* conclude that 'there would in any event have been no reasonable accommodation available.'" *Id.* (quoting *Morton*, 272 F.3d at 1256). Meanwhile, to avoid summary judgment, an employee "need only show that an 'accommodation' *seems reasonable on its face*, i.e., ordinarily or in the run of cases." *Id.* (quoting *US Airways*, 535 U.S. at 401-02).

Here, the Court concludes Tornabene has presented evidence to meet her burden that her requested accommodation—working mostly from home—seems reasonable on its face. In contrast, however, the evidence does not show the City engaged in the mandatory interactive process. Once Tornabene requested an accommodation, the City had a mandatory duty to engage in an interactive process to identify and implement, if possible, a reasonable accommodation that would have permitted Tornabene to retain her employment. Rather than in engage in this process,

MEMORANDUM DECISION AND ORDER - 17

however, the City denied Tornabene's requested accommodation without suggesting any additional alternative solutions or exploring with her the possibility of other accommodations. Instead, the City considered the matter closed. For example, Mayor Carroll emailed Tornabene stating that "as I've stated many times, I do not believe the HR Director can fulfill all of the essential duties of the position entirely from home. . . . I cannot be moved from that viewpoint." (Dkt. 34-21 at p. 21). This evidence indicates the City refused to discuss or consider the possibility of other accommodations aside from requiring Tornabene to come into the office for two regularly designated hours every day. Accordingly, the Court concludes the issue of whether the City failed to engage in the mandatory interactive process presents a genuine, material factual issue precluding summary judgment.

### 5.      Unlawful Discharge

Tornabene also argues the City violated the ADAAA when it terminated her employment because of her disability. An employer is prohibited from discriminating against a qualified individual with a disability because of that disability. *Nunes*, 164 F.3d at 1246. To establish a prima facie case of disability discrimination, a plaintiff must show that: (1) she is a disabled person within the meaning of the statute; (2) she is qualified, with or without reasonable accommodation, to perform the essential functions of the job; and (3) she suffered an adverse employment action because of her disability. *Braunling v. Countrywide Home Loans Inc.*, 220 F.3d 1154, 1156 (9th Cir. 2000).

The Ninth Circuit has noted, however, that a failure to accommodate claim and an unlawful discharge claim are, as a practical matter, the same claim when the failure to accommodate results in an alleged unlawful termination. *Humphrey*, 239 F.3d at 1139. "The link between the disability and termination is particularly strong where it is the employer's failure to reasonably accommodate

a known disability that leads to discharge for performance inadequacies resulting from that disability." *Id.* at 1140.

Here, Tornabene's failure to accommodate claim and her unlawful discrimination claim are essentially the same claim because there is a causal connection between her disability, which prevented her from going to the office on a regular basis, and the City's termination of her employment for that reason. *See id.* (concluding sufficient causal connection between employee's disability and termination where employer discharged employee for reasons her disability caused). Moreover, Tornabene presented direct evidence indicating the City terminated her employment because she had long-COVID.

For example, Tornabene recalls that McNeel and Carroll said serious symptoms from COVID-19 were not real and that Carroll compared COVID-19 to "just a cold." (Dkt. 34-10, ¶ 26). Tornabene also heard McNeel say that employees were using COVID-19 as excuse to stay home and watch Netflix; she wanted proof of every positive test; and employees were "stealing from the City" by working from home. (*Id.*) Further, McNeel acknowledged she agreed with a department head that they had created "a monster" by allowing Tornabene to work remotely. (Dkt. 34-5 at p. 29). Based on this evidence, a jury could reasonably find the requisite causal link between Tornabene's disability and the City's termination of her employment because of that disability.

## C.    Gender Discrimination

In Count V, Tornabene alleges the City discriminated against her because of her gender in violation of Title VII and the IHRA. (Dkt. 1 at ¶¶ 63-69). A prima facie case of gender discrimination requires a plaintiff to show that: (1) she belongs to a protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) similarly situated men were treated more favorably, or a man filled her position. *French v. Idaho State AFL-*

*CIO*, 164 F. Supp. 3d 1205, 1215 (D. Idaho 2016) (citing *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1062 (9th Cir. 2002)). "A claim of disparate treatment requires direct or circumstantial proof of discriminatory motive." *Washington v. Garrett*, 10 F.3d 1421, 1431-32 (9th Cir. 1993).

In support of her gender discrimination claim, Tornabene relies on a survey a third party conducted for the City regarding the competitiveness of its employee wages. The survey recommended that the entire police department receive a pay increase and that the City place that department on its own salary schedule. (Dkt. 29-5 at pp. 89-90). Further, the survey recommended the Treasurer and the HR Director receive pay increases, including two paygrade increases for Tornabene, who was the HR Director at that time. (*Id.*). The Treasurer was also a woman, and both the Treasurer and HR Director positions were paid substantially less than male department heads.

The City adopted the survey's recommendation for the police department employees, all of whom were male but one. (Dkt. 34-4 at pp. 34, 37). The City, however, rejected the survey's recommendation to increase the Treasurer's and HR Director's pay because of budget constraints. (*Id.* at pp. 36-37). As a result, Tornabene continued to be paid below market rate, according to the survey, until her discharge in September 2021. (Dkt. 34-10, ¶¶ 4-5, Ex. A and B).

Assuming Tornabene timely asserted her gender discrimination claim, she fails to show that the City treated similarly situated men more favorably or that her gender played a role in the City's employment decisions. Contrary to Tornabene's assertion, an HR Director and police officers are not similarly situated and do not perform substantially equal jobs. Further, Tornabene cites no evidence to suggest the City did not give her a pay raise because she is woman.

Also, in support of her gender discrimination claim, Tornabene relies on the fact that her replacement was a man. She maintains that the City paid her $27.01 an hour at the time of her discharge in September 2021 and that it paid her male replacement $27.88 an hour when the City

**MEMORANDUM DECISION AND ORDER - 20**

hired him in December 2021. The City has presented undisputed evidence, however, that Tornabene was paid $27.85 an hour at the time of her discharge; she would have received a 3.2 percent cost-of-living adjustment in October 2021; and she would have been paid $28.74 in December 2021 had she remained a City employee. (Dkt. 29-3 at p. 3, McNeel Decl. ¶¶ 8-9). In other words, her male replacement started at a lower rate than she would have been earning in December 2021.

Finally, in support of her gender discrimination claim, Tornabene argues the evidence shows the City allowed "male employees much more leeway to work remotely, leave work whenever they wanted, take as much time off as they needed, and were provided with pay by the City even after running out of PTO." (Dkt. 34 at p. 14). Tornabene, however, cites no evidence suggesting the City allowed male employees to work remotely because they are men or denied her the same accommodation because she is a woman. Further, she fails to show she was similarly situated to men who received disability accommodations because they held different positions and suffered from different medical conditions. For these reasons, Tornabene's gender discrimination claim fails. Likewise, for these same reasons, her equal protection claim, Count VI, fails. Accordingly, the Court grants Defendant's summary judgment motion on Counts V and VI.

**D.    FMLA**

Finally, Tornabene alleges in Count VII that Defendants forced her to take FMLA leave and interfered with her right to use her FLMA leave as needed. Congress enacted the FMLA to "balance the demands of the workplace with the needs of families [and] to entitle employees to take reasonable leave for medical reasons." 29 U.S.C. § 2601(b).  To that end, "[t]he FMLA creates two interrelated substantive rights for employees." *Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1132 (9th Cir. 2003). First, an employee may take up to twelve weeks of leave for the reasons set forth

in § 2612(a)(1). *Xin Liu*, 347 F.3d at 1132. Second, an employee who avails herself of FMLA leave "has the right to be restored to his or her original position or to a position equivalent in benefits, pay, and conditions of employment upon return from leave." *Id.* The FMLA sets out two methods of protecting the above substantive rights. *Sanders v. City of Newport*, 657 F.3d 772, 777 (9th Cir. 2011).

First, covered employers are prohibited from interfering with, restraining, or denying the exercise of or the attempt to exercise, any right the FLMA provides. 29 U.S.C. § 2615(a)(1). Second, employers are prohibited from discharging or in any other manner discriminating against any individual for opposing any practice the FMLA makes unlawful. 29 U.S.C. § 2615(a)(2). Claims brought under § 2615(a)(1) are "interference" claims, and claims brought under § 2615(a)(2) are "retaliation claims." *Sanders*, 657 F.3d at 777. Tornabene alleges both an interference claim and a retaliation claim.

### 1.    Interference

To make out a prima facie case of FMLA interference, an employee must establish that: (1) she was eligible for the FMLA's protections; (2) her employer was covered by the FMLA; (3) she was entitled to leave under the FMLA; (4) she provided sufficient notice of her intent to take leave; and (5) her employer denied her FMLA benefits to which she was entitled. *Escriba v. Foster Poultry Farms, Inc.*, 743 F.3d 1236, 1243 (9th Cir. 2014).

Contrary to the prima facie case, however, Tornabene does not allege that the City denied her request to take FMLA leave. Instead, she argues the City interfered with her FMLA rights by forcing her to take FMLA leave to "burn up" her leave entitlement. The Ninth Circuit has not yet recognized a "forced-leave claim" under the FLMA, and courts that have recognized such a claim requires the employee to show the employer wrongfully forced the employee to take FMLA

leave—even though the employee did not have a "serious health condition" precluding her from working at the time. *See, e.g.*, *Wysong v. Dow Chem. Co*., 503 F.3d 441, 449 (6th Cir. 2007).

Here, Tornabene makes no allegation she was forced to take leave despite not having a serious health condition.  Further, she fails to cite any authority indicating courts have recognized a FMLA interference claim under circumstances similar to this case. Absent such authority, this Court declines to recognize the claim that the City forced her when she had a serious health condition to take FMLA.

### 2.     Retaliation

Tornabene also alleges that the City retaliated against her for taking FMLA leave. To establish a prima facia case of FMLA retaliation claim, a plaintiff must show that: (1) she took or requested protected leave; (2) the employer subjected her to an adverse employment action; and (3) the request to take or taking of protected leave was a "negative factor" in the adverse employment decision. *See Washington v. Fort James Operating Co.*, 110 F. Supp. 2d 1325, 1331 (D. Or. 2000). If the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse action. *Sanders*, 657 F.3d at 777, n.3. If the employer articulates a legitimate reason for its action, the burden shifts back to the plaintiff to show the reason given is pretext. *Id.*

Although no dispute exists that Tornabene took FMLA leave (at the City's insistence), and that the City discharged her after she took such leave, Tornabene fails to establish a prima facie case because she offers no evidence of a causal link between her protected FMLA leave in 2020 and her discharge in September 2021. To the contrary, even under Tornabene's version of the facts, the evidence shows the City discharged her for not maintaining a regular, in-person work schedule. Without any evidence that Tornabene's FMLA leave was a negative factor in the City's decision

MEMORANDUM DECISION AND ORDER - 23

to terminate her employment, Tornabene's FMLA retaliation claim fails.  Accordingly, the Court grants Defendants' summary judgment motion on Count VII.

## V.  ORDER

**IT IS ORDERED that:**

1.      Defendants' Motion for Summary Judgment (Dkt. 29) is **GRANTED** on Counts V, VI, and VII and **DENIED** on Counts I, II, III, and IV.

2.      Plaintiff's Amended Motion to Strike (Dkt. 40) is **DENIED** as moot.

DATED: September 11, 2024

Amanda K. Brailsford
U.S. District Court Judge